IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DANIEL PATRICK DIGGIN, | : | CIVIL ACTION |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| ANDREW SAUL,[1] | : | |
| Acting Commissioner of Social Security, | : | |
| Defendant. | : | No. 19-0022 |


# MEMORANDUM OPINION

**LINDA K. CARACAPPA**
**UNITED STATES CHIEF MAGISTRATE JUDGE**

Plaintiff Daniel Patrick Diggin brought this action under 42 U.S.C. § 405(g),

seeking judicial review of the final decision of the Commissioner of Social Security

("Commissioner") denying plaintiff's claims for Disability Insurance Benefits ("DIB") and

Supplemental Security Income ("SSI") under Title II and Title XVI of the Act.  In accordance

with 28 U.S.C. §636(c), Fed. R. Civ. P. 72, and Local Rule 72.1, consent to the exercise of

jurisdiction by a Magistrate Judge has been established.

Presently before this court are plaintiff's request for review and the

Commissioner's response.  For the reasons set forth below, plaintiff's request for review is

GRANTED, and remand ordered.

I.      FACTUAL AND PROCEDURAL HISTORY

Plaintiff was born on February 19, 1992 and was twenty-three (23) years old on

---

[1] Andrew Saul is now the Commissioner of Social Security.  Pursuant to Rule 25(d) of the Federal Rules of Civil
Procedure, Andrew Saul should be substituted for Acting Commissioner Nancy A. Berryhill as the defendant in this
suit.  No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the
Social Security Act, 42 U.S.C. § 405(g).

the alleged disability onset date.  (Tr. 18).  Plaintiff has a high school education and past relevant work as a vendor.  (Tr. 18).

On January 22, 2016, plaintiff protectively filed applications for SSI and DIB. (Tr. 192-201).  Plaintiff alleged the disability onset date to be October 1, 2015.  (Tr. 192). Plaintiff's applications were denied at the state level on March 9, 2016.  (Tr. 116-127).  Plaintiff subsequently requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. 130-135).

On January 10, 2018, ALJ Suzette Knight held a hearing and heard testimony from plaintiff, and plaintiff's father, who were present with counsel.  (Tr. 30-93).  On February 21, 2018, ALJ Knight issued an opinion finding plaintiff not disabled under the Act from October 1, 2015 through the date of the decision.  (Tr. 7-20).  Plaintiff filed a request for review, and on November 5, 2018, the Appeals Council denied plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-6).  Plaintiff appealed that decision to this court.

II.    LEGAL STANDARDS

Upon judicial review, this court's role is to determine whether the ALJ's decision is supported by substantial evidence.  42 U.S.C. § 405(g); Pierce v. Underwood, 587 U.S. 552 (1988).  "Substantial evidence is more than a mere scintilla but may be somewhat less than a preponderance of the evidence."  Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005).  It is relevant evidence viewed objectively as adequate to support a decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971); Kangas v. Bowen, 823 F.2d 775 (3d Cir. 1987); Dobrowolsky v. Califano, 606 F.2d 403 (3d Cir. 1979).  In determining whether substantial evidence exists, the reviewing court may not weigh the evidence or substitute its own conclusion for that of the ALJ. Burns v. Barnhart, 312 F.3d 113, 118 (3d Cir. 2002).  If the court determines the ALJ's factual

findings are supported by substantial evidence, then the court must accept the findings as conclusive.  Richardson, 402 U.S. at 390; Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999).  It is the ALJ's responsibility to resolve conflicts in the evidence and to determine credibility and the relative weights to be given to the evidence.  Richardson, 402 U.S. at 401.  While the Third Circuit Court of Appeals has made it clear that the ALJ must analyze all relevant evidence in the record and provide an explanation for disregarding evidence, this requirement does not mandate the ALJ "to use particular language or adhere to a particular format in conducting his analysis." Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004).  Rather, it is meant "to ensure that there is sufficient development of the record and explanation of findings to permit meaningful review." Id.  Moreover, apart from the substantial evidence inquiry, a reviewing court must also ensure that the ALJ applied the proper legal standards.  Coria v. Heckler, 750 F.2d 245 (3d Cir. 1984).

   To establish a disability under the Act, a claimant must demonstrate that there is some "medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period."  Stunkard v. Sec'y of Health and Human Servs., 841 F.2d 57 (3d Cir. 1988) (quoting Kangas, 823 F.2d at 777); 42 U.S.C. § 423(d)(1) (1982).  The claimant satisfies his burden by showing an inability to return to his past relevant work.  Doak v. Heckler, 790 F.2d 26, 28 (3d Cir. 1986); Rossi v. Califano, 602 F.2d 55, 57 (3d Cir. 1979) (citing Baker v. Gardner, 362 F.2d 864 (3d Cir. 1966)).  Once this showing is made, the burden of proof shifts to the Commissioner to show that the claimant, given his age, education, and work experience, has the ability to perform specific jobs that exist in the economy.  See 20 C.F.R. § 404.1520; Rossi, 602 F.2d at 57.

   As explained in the following agency regulation, each case is evaluated by the Commissioner according to a five-step process:

(i) At the first step, we consider your work activity if any. If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 404.1509, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520 (references to other regulations omitted).

III.     ADMINISTRATIVE LAW JUDGE'S DECISION

Pursuant to the five-step sequential evaluation process, the ALJ determined plaintiff had not been under a "disability," as defined by the Act, from October 1, 2015 through February 21, 2018, the date of the ALJ's decision. (Tr. 19-20).

At step one, the ALJ found plaintiff had not engaged in substantial gainful activity since October 1, 2015. (Tr. 13). At step two, the ALJ found plaintiff's multiple sclerosis, affective disorder, and organic mental disorder to be severe impairments. (Tr. 13). The following summarized medical records pertain to the issues at bar:

In April 2010, plaintiff was diagnosed with Relapsing Remitting Multiple Sclerosis ("RRMS" or "MS"). (Tr. 531). At the time of diagnosis, plaintiff presented with

spinal cord involvement and onset of symptoms that included paresthesia in the right hemi-body below T4. Id. Plaintiff also experienced ocular symptoms but had a normal OCT and eye exam. Id.

On September 16, 2014, plaintiff was seen for a neurological consultation with Dr. Joyce Liporace, M.D., at Great Valley Neurological Associations. (Tr. 531-534). The physical exam was unremarkable. (Tr. 532-533). It was noted that plaintiff had a history of Percocet addiction and was taking the medication Suboxone. (Tr. 534). It was also noted that plaintiff has a history of anxiety disorder and that anxiety can be linked with MS. (Tr. 534).

On September 18, 2014, plaintiff was seen for a neurological consultation with Nurse Ruth Brobst, MSN CRNP, at Great Valley Neurological Associations. (Tr. 527-530). It was noted that plaintiff had recently changed MS medications from Gilenya to Tysabri. (Tr. 527). The medication change was due to plaintiff experiencing symptoms such as photosensitivity that were attributed to Gilenya. Id. It was noted that plaintiff was tolerating Tysabri well but experiencing some fatigue. Id. The photosensitivity had also improved 50% since plaintiff stopping Gilenya. Id. It was reported that plaintiff was able to read and that his distance vision was intact. Id. Fatigue was noted to be a problem. (Tr. 527). It was noted that exercise may have some benefits for fatigue, but plaintiff reported having bad days following heavy physical activity. Id. Plaintiff reported that his heat tolerance was fair, "but admits that while he had been a lifeguard at one point he could not do that now because of intolerance to heat." Id. It was noted that plaintiff had suffered a hemisensory relapse in April 2014, but that it had resolved with steroids and was not recurrent. Id. It was also noted during another visit that in March 2014 plaintiff had numerous flares of the left arm and left leg paresthesia. (Tr. 531).

On January 2, 2015, plaintiff was seen for a neurological consultation with Nurse

Brobst.  (Tr. 468).  Treatment notes indicate that plaintiff had been on Tysabri for the past few months and was reporting some fatigue after the infusions, which had improved over time.  Id. Plaintiff experience no sudden change in function indicating relapse and reported no paresthesia or problems with cognition.  Id.  Plaintiff reported fatigue that "waxes and wanes" and occasional knee and joint pain.  Id.  Plaintiff reported falling twice during 2014 due to being "so tired that he stumble[d] and [fell]."  Id.  Plaintiff also reported persistent light sensitivity explaining that it felt like pain behind the eyes causing a tendency to want to squint in bright light.  Id.  Plaintiff reported that the discomfort was at times bothersome enough that he needed to go into a dark room.  Id.  The physical exam was unremarkable.  (see Tr. 470).  Treatment notes indicate that plaintiff had seen an ophthalmologist and neuro-ophthalmologist regarding the light sensitivity, but that they could not think of any intervention other than tinted glasses lenses.  (Tr. 472).

On January 20, 2015, plaintiff had an MRI of his brain with and without contrast. (Tr. 453).  The exam showed mild interval progression of the demyelinating disease (MS).  (Tr. 453).  Specifically, it was noted that there were at least fifteen (15) small T2 hyperintense foci throughout the periventricular and subcortical white matter and that at least five (5) of the lesions were new since the prior study and involved the right frontal lobe and left corona radiate.  Id. Additionally, it was noted that one lesion, within the right frontal corona, had increased in size since the prior study.  (Tr. 453).  There were no convincing foci of pathologic enhancement.  Id.

On January 27, 2015, plaintiff had an MRI of his cervical spine with and without contrast.  (Tr. 455).  The exam showed increased T2 signal within the spinal cord at the C2 level centrally and on the right side and spinal cord thickening at the C2 level.  Id.  These findings were noted to be consistent with, but not specific for, myelopathy from MS.  Id.  It was noted

that distally there were some pulsation artifact creating artifactual signal in the cord.  Id.  It was noted that there were possibly additional tiny focus of myelopathy and signal abnormality in the spinal cord at the T2 level.  Id.  Mild spondylosis was noted.  Id.  There was also abnormal contrast enhancement in the spinal cord.  Id.

On February 5, 2015, plaintiff was seen by his family doctor, Dr. Michael A. Krafchick, D.O.  (Tr. 357).  Plaintiff's medical history included MS, opioid dependence for which he was in recovery with no relapses, and depression.  (Tr. 357).  Treatment notes indicate that plaintiff was compliant with his MS medications, but that plaintiff most recent MRI's showed new brain lesions.  Id.  Plaintiff reported feeling well and did not report any new MS symptoms.  Id.  Plaintiff denied joint pain, poor balance, headaches, anxiety, depression, cold and heat intolerance.  (Tr. 358).  Physical exam revealed plaintiff to be well developed and well-nourished and in no acute distress.  (Tr. 359).

Plaintiff continued to have monthly appointments with Dr. Krafchick.  On March 2, 2015, plaintiff was seen by Dr. Krafchick reporting loss of appetite, indigestion, nausea, abdominal bloating, change in bowel habits, stiffness and muscle aches, tingling, and depression.  (Tr. 361-62).  Physical exam was unremarkable.  (Tr. 363).  On April 24, 2015, plaintiff reported low back pain, joint pain, and stiffness.  (Tr. 371).  On May 22, 2015, plaintiff reported back pain, stiffness, numbness, and tingling.  (Tr. 378).  On June 19, 2015, plaintiff reported mild myalgia with infusion of MS prescription.  (Tr. 382).  Plaintiff did not report visual changes or weakness.  Id.  On July 10, 2015, plaintiff reported experiencing a recent "flare" that improved with Aubagio infusion.  (Tr. 387).  On August 5, 2015, plaintiff reported numbness.  (Tr. 394).  On September 28, 2015, plaintiff reported body aches, muscle aches, anxiety, and some nausea.  (Tr. 403).  Dr. Krafchick's treatment notes indicate that although plaintiff's recent infusion went

well, plaintiff had to withdrawal from school due to MS. (Tr. 407).

On June 30, 2015, plaintiff was seen for a neurological consultation with Dr. Liporace. (Tr. 475-479). Plaintiff reported experiencing left leg paresthesia, explaining that the left leg felt stiffer and slightly weaker. (Tr. 475). Plaintiff reported being unsteady, but no falls. Id. Plaintiff reported ocular symptoms but had a normal OCT and eye exam. Id. Physical exam revealed mild anisocoria, normal motor strength except left iliopsoas which was 4/5, and abnormal coordination with slow rapid alternative motion of left-leg and arm. (Tr. 476-77). Dr. Liporace noted that plaintiff's left leg symptoms had increased. (Tr. 477-78). It was noted that plaintiff's anti-JCV antibody was negative. (Tr. 478). It was also noted that plaintiff suffered from generalized anxiety. (Tr. 478). It was noted that plaintiff's January 2015 cervical spine MRI showed no new lesions and that plaintiff's January 2015 brain MRI showed fifteen (15) white matter lesions, five (5) of which were new but no enhancing lesions. (Tr. 477)

On August 4, 2015, plaintiff had an MRI of his thoracic spine with and without contrast. (Tr. 458). The exam showed several new tiny areas of myelopathy in the thoracic spinal cord, but no indication of active plaquing. Id. It was noted that the previously demonstrated lesion at T3-T4 had improved. Id. It was also noted that the previously demonstrated area of signal abnormality at the T3-T4 level had significantly improved and was barely visualized on the T2 images. Id. The spinal cord no longer showed thickening. Id. Tiny vertebral edging was noted on the right side at T3-T4. (Tr. 459).

On November 10, 2015, plaintiff was seen for a neurological consultation with Dr. Liporace. (Tr. 480-484). Plaintiff reported experiencing left leg paresthesia, explaining that the left leg feels stiffer and slightly weaker. (Tr. 480). Plaintiff also reported feeling "very tired" and that "he falls asleep easily." Id. Plaintiff reported sleeping eight (8) to nine (9) hours per

night and not exercising at all.  Id.  Plaintiff reported being unsteady, but no falls.  Id.  Physical exam revealed mild anisocoria, normal motor strength except left iliopsoas which was 4/5, and abnormal coordination with slow rapid alternative movement of left-leg and arm.  (Tr. 481-82). Plaintiff was ordered to have a sleep study and it was noted that plaintiff had an abnormal thyroid test, which plaintiff needed to follow up on.  (Tr. 484).

On November 16, 2015, plaintiff was seen by Dr. Krafchick.  (Tr. 415).  Plaintiff reported onset of malaise and fatigue for the past month.  Id.  Treatment notes indicate that plaintiff's depression may be worsening.  (Tr. 419).

On November 19, 2015, plaintiff was seen at Providence Ear Nose Throat for a consultation with Dr. Mark A. Ginsburg, D.O.  (Tr. 495).  Treatment notes indicate that plaintiff's most recent MRI showed inflammation in his throat.  Id.  Treatment notes indicate plaintiff presented with recurrent tonsillar infection and fatigue.  Id.  The impression after physical exam was hypertrophy of tonsils with hypertrophy of adenoids and allergic rhinitis.  (Tr. 496).  Plaintiff was instructed to have a CT scan and given a prescription of Clarithromycin.  Id. On November 20, 2015, plaintiff had the recommended CT scan.  (Tr. 540).  The exam showed asymmetry prominence of the soft tissues of the nasopharynx on the right side.  Id.  No evidence of underlying focal mass.  Id.  The parapharyngeal was noted to be normal in appearance.  Id. The findings suggested adenoidal hypertrophy.  Id.  It was also noted that the study did not rule out occult neoplastic process.  Id.   On December 10, 2015, plaintiff was again seen at Providence Ear Nose Throat by Dr. Ginsburg for a follow-up.  (Tr. 497).  Plaintiff reported continuing fatigue.  Id.  Dr. Ginsburg scheduled an adenoid biopsy.  (Tr. 498).

On December 15, 2015, plaintiff was seen by Dr. Wei Bin, M.D. (Tr. 499-500). Plaintiff complained of "significant daytime fatigue" and tiredness and reported feeling non-

refreshed in the morning and groggy all day. (Tr. 499). Plaintiff reported taking a one hour nap each day. Id. It was noted that plaintiff had no history of snoring, sleep apnea, night time gasping, choking at night, periods of breath holding, sore throat and difficulty swallowing. Id. Dr. Bin's impression was that plaintiff's asthma was not well controlled and that plaintiff's tobacco and marijuana use played a role in it being hard to control. (Tr. 500). Dr. Bin noted that plaintiff "did not give [the] typical symptoms suggest[ing] obstructive sleep apnea" and noted that a home sleep study was necessary. (Tr. 500). Dr. Bin noted plaintiff's fatigue could be a result of central apnea associated with plaintiff's MS, narcolepsy without catalepsy, or the sedative effects of Mirtazapine, which plaintiff was proscribed for anxiety. (Tr. 500).

On January 14, 2016, plaintiff was seen for a neurological consultation with Nurse Brobst. (Tr. 506-484). It was noted that plaintiff's November 2015 brain MRI showed right cervical lymphadenopathy and asymmetric prominence of the soft tissues of the right nasopharynx. (Tr. 506). As indicated by the MRI, plaintiff had been evaluated by an ENT and had a CT of the neck. Id. Antibiotics were prescribed and the tissue biopsy was negative. Id. It was noted that plaintiff's MS was stable and that one of plaintiff's MS symptoms was overwhelming fatigue. Id. Plaintiff reported not feeling refreshed in the morning, that his limbs felt heavy, and mental fog. Id. Treatment notes indicate that plaintiff found the fatigue very frustrating and that it was important to him to understand why it was occurring. Id. Treatment notes indicate "[plaintiff] has a hard time understanding that the fatigue could be from the MS alone." Id. Plaintiff's ocular symptoms were noted to be painful eyes, light sensitivity, and pain behind the eyes, but no changes in vision. Id. It was noted that plaintiff had a neuroophthalmological evaluation with Dr. Sergott who was considering neuromyelitis optica and Susac syndrome and that related laboratory studies were pending. Id. Plaintiff also reported

feeling low and as though everything required too much effort.  Id.  Plaintiff did not believe that he was depressed rather he belived that the fatigue was negatively impacting his mood.  Id.  Plaintiff reported no drive, no motivation, feeling emotionally flat, and being so fatigued that he could not work.  (Tr. 506).  Physical exam was unremarkable.  (Tr. 507-08).

Nurse Brobst also noted that plaintiff's November 2015 brain MRI showed white matter lesions consistent with MS, but that no new or enhancing lesions were noted. (Tr. 508). Treatment notes indicate that plaintiff's mother suggested changing MS medication in order to hopefully relieve plaintiff's fatigue; however, Nurse Brobst indicated that a change in MS medication would likely not address the fatigue because Tysabri is not related to fatigue. (Tr. 506, 509).  It was also noted that plaintiff and his mother were very concerned about what was causing the fatigue and wanted to ensure that all possible diagnostic studies had been completed. (Tr. 509).  Nurse Brobst noted that "[i]t is entirely possible the fatigue is from the MS.  95% of people with MS report fatigue which is overwhelming and often disabling.  Fatigue is the number one reason why patients leave the work force."  Id.  It was also noted that there are no specific diagnostic studies to measure or diagnose MS-related fatigue.  Id.

On November 13, 2016, plaintiff had an MRI of his brain with and without contrast.  (Tr. 462-63).  The exam revealed stable demyelinating white matter plaques, no new or active lesions, and no lesions demonstrate restricted diffusion.  (Tr. 462).  It was noted that multiple supratentorial T2 hyperintense lesions within the periventricular and subcortical white matter are stable from the prior study.  Id.  It was noted that the lesions in the bilateral frontal white matter are less conspicuous on axial FLAIR images.  (Tr. 462-63).  Asymmetric fulness of the right nasopharyngeal soft tissues was noted as well as cervical lymphadenopathy.  (Tr. 462).

On July 11, 2016, plaintiff was seen by Dr. Liporace for a neurological follow up.

(Tr. 564-567).  It was noted that plaintiff's lymphocyte count was high.  Id.  Plaintiff had a

Modafinil trial without benefit and plaintiff was noted to be now taking Vyvanse with

improvement.  Id.  Physical exam was unremarkable except for notations that plaintiff

coordination was abnormal and that plaintiff's slow rapid alternating movements of the left-leg

and arm were slow.  (Tr. 565-66).  It was noted that Tysabri, the medication plaintiff had been on

for two years, is associated with a serious brain infection called PML.  Id.  PML is fatal in one

third of cases and causes severe disability in on third of cases.  (Tr. 565-66).  Plaintiff's June labs

showed that his JCV antibody was positive with an index of 3.11 and plaintiff's positive JCV test

is an indicator of PML.  (Tr. 564, 566-57).  It was noted that the positive JCV test was

concerning, and that plaintiff needed to consider switching MS therapy to avoid the risk of

getting PML.  Id.  It was suggested that plaintiff get an opinion from another MS specialist.  (Tr.

567).  Plaintiff's fatigue was noted as an ongoing symptom.  (Tr. 567).

On July 12, 2016, plaintiff had an MRI of his brain with and without contrast.

(Tr. 562).  The exam showed unchanged manifestations of demyelinating disease and no

evidence of active disease.  (Tr. 562).  It was noted that there were a few scattered small foci of

T2 signal hyperintensity within the periventricular and subcortical white matter.  No evidence of

abnormal enhancement was noted.  Id.

On October 24, 2016 and November 10, 2016, plaintiff was seen by Dr. Dina

Jacobs, M.D., at University of Pennsylvania Hospital.  (Tr. 699).  Plaintiff reported eye pain in

both eyes and right knee pain resulting in weakness and falls due to buckling of his right knee,

short-term memory difficulty, fatigue, and occasional tonic spasms in the right leg and knee.

(Tr. 700).  Physical exam was unremarkable except plaintiff's gait was noted to be narrow-based,

but with no evidence of ataxia.  (Tr. 701).  Dr. Jacobs noted that plaintiff would continue with

Tysabri for now but because he was JCV positive he would need to consider other options. (Tr. 702). Plaintiff was also seen by Dr. Jacobs in November and reported feeling well. (Tr. 704).

On January 6, 2017, plaintiff was seen by Dr. Jacobs. (Tr. 708). Plaintiff did not report any new symptoms but was concerned about not feeling well after his last Tysabri infusion. Id. Dr. Jacobs noted that plaintiff was clinically stable and that his exam was stable. Id. Plaintiff's strength and coordination were noted to be normal as was plaintiff's gait. Id. It was discussed that plaintiff would discontinue Tysabri considering his positive JCV status and would switch over to ocrelizumab. Id.

On February 14, 2017, plaintiff was seen by Dr. Jacobs. (Tr. 713). It was noted that plaintiff suffered from photophobia, moderate executive function cognitive impairment, impaired speed of processing, short-term memory difficulty, decreased focusing, motor fatigue, and moderate to severe fatigue. (Tr. 714).

On April 20, 2017, plaintiff was seen by Dr. Jacobs. (Tr. 717). It was noted that plaintiff started Rituxan and had a reaction requiring that the infusion be stopped, and plaintiff receive IV fluids. (Tr. 717).

On October 25, 2017, plaintiff underwent a neuropsychological evaluation at the University of Pennsylvania Hospital. (Tr. 729). The report summarizes that plaintiff was referred for the evaluation due to MS related cognitive difficulties. (Tr. 735). The report summarized that plaintiff's memory was intact for stories and designs, but that that he performed less well when the material was unstructured and struggled to create structure to aid in recall. Id. Plaintiff also demonstrated weaknesses in the areas of processing speed, inferential reasoning, copying of a complex design, semantic fluency, and novel problem solving. Id. These weaknesses were indicated to be due to reduced attention to visual detail and weak visual

integration/organization.  Id.

On December 7, 2017, plaintiff was seen by Dr. Jacobs.  (Tr. 726).  Plaintiff reported increased fatigue.  Id.  Plaintiff had previously been prescribed Adderall as needed but reported needing it more frequently due to fatigue being overwhelming.  Id.  Plaintiff was encouraged to start physical therapy to help increase endurance to deal with fatigue.  (Tr. 28).

Continuing with the five-step sequential evaluation, at step three, the ALJ found plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R., Part 404, Subpart P, Appendix 1.  (Tr.13).  At step four, the ALJ found plaintiff had the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) and 406.967(b) except for the follow limitations:

> [Plaintiff] can stand for 2 hours and walk for 2 hours in an 8-hour work day.  The [plaintiff] can occasionally climb ramps, stairs, ladders, ropes, and scaffolds.  The [plaintiff] can occasionally balance, stoop, kneel, crouch, and crawl.  The [plaintiff] can occasionally work at unprotected heights, around moving mechanical parts, in extreme heat, and in vibrations.  The [plaintiff] is limited to simple routine and repetitive tasks.

(Tr. 15).  The ALJ noted that she had considered all symptoms and the extent to which these symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence.  Id.  Further, the ALJ considered opinion evidence.  Id.

The ALJ determined that while plaintiff had medically determinable impairments that could reasonably be expected to cause the alleged symptoms, plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were not consistent with the medical evidence and other evidence in the record.  (Tr. 16).

Finally, at step five, the ALJ found that given plaintiff's residual functional capacity, there were jobs that exist in significant numbers in the national economy that plaintiff

could perform.  (Tr. 18).  Thus, the ALJ determined plaintiff had not been under a "disability," as

defined in the Act, from October 1, 2015 through February 21, 2018, the date of the ALJ's

decision.  (Tr. 19).

## IV.     PLAINTIFF'S CONTENTIONS

Plaintiff argues: (A) the ALJ did not properly weigh the opinion evidence of Dr.

Jacobs.

## V.      DISCUSSION

The Commissioner's findings must be affirmed if they are supported by

substantial evidence.  42 U.S.C. § 405(g); Richardson, 402 U.S. at 401.  The role of this court is

to determine whether substantial evidence supports the Commissioner's decision.  Williams v.

Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992), *cert. denied*, 507 U.S. 924, 113 S. Ct. 1294 (1993).

After review of the record, plaintiff's request for review must be granted.

### A.  Claim One: Whether the ALJ Properly Assessed the Medical Opinion Evidence

Plaintiff contends that the ALJ failed to properly evaluate the medical opinion

evidence, consequently, the ALJ's residual functional capacity finding is not supported by

substantial evidence.  Pl. Br. at 4-5.  Plaintiff argues that the opinion of Dr. Jacobs establishes

"far greater, and more detailed limitations than the ALJ found" and "establish that plaintiff met

his burden of proof to come forward with evidence demonstrating that he is 'disabled' pursuant

to the Agency's definition."  Id. at 5.  Plaintiff further argues that the ALJ did not sufficiently

explain her reasoning for rejecting the opinion of the only treating or examining neurologist to

offer an opinion regarding plaintiff's impairments.  Id. at 7.  The Commissioner responds that the

ALJ's evaluation of Dr. Jacobs' opinions is in accordance with the regulations.  Def. Reply at 4.

We find that the ALJ's evaluation of Dr. Jacobs' opinion is insufficient.  Therefore, we find

plaintiff's request for remand must be granted.

On November 30, 2017, Dr. Jacobs filled out a Multiple Sclerosis Residual Functional Capacity Questionnaire on plaintiff's behalf. (Tr. 556-560). Dr. Jacobs noted that she had been treating plaintiff since 2016 and saw him every three (3) months or more as needed. (Tr. 556). Dr. Jacobs indicated that plaintiff had MS diagnosed with MRI imagining of the brain and thoracic spine. Id. Dr. Jacobs indicated plaintiff experienced the following symptoms by checking the appropriate box: fatigue, balance problems, poor coordination, weakness, unstable walking, numbness, tingling, sensory disturbances, increased muscle tension, bladder problems, bowel problems, sensitivity to heat, pain, difficulty remembering, depression, difficulty solving problems, problems with judgment, double or blurred vision, complete blindness, involuntary rapid eye movement, shaking tremor, and speech/communication difficulties. (Tr. 556). Dr. Jacobs' indicated that plaintiff was not a malingerer. Id. Dr. Jacobs opined that plaintiff experienced significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movement or gait and station explaining that plaintiff experienced muscle fatigue, weakness, tingling and numbness that interfered with plaintiff's use of fingers, hands, and arms. (Tr. 556). Dr. Jacobs opined that plaintiff experienced extreme limitations in standing from a seated position and maintaining balance in a standing position while walking, including an inability to maintain an upright position without the assistance of a walker and/or inability to stand and remain upright without use of a walker explained that plaintiff has difficulty and limitations due to numbness, cramping, and extreme fatigue. (Tr. 556-57). Dr. Jacobs noted that emotional factors contribute to the severity of plaintiff's symptoms and functional limitations. (Tr. 557). Dr. Jacobs opined that plaintiff constantly experienced pain, fatigue or other symptoms severe enough to interfere with

attentional and concentration.  Id.  Dr. Jacobs opined that plaintiff was incapable of tolerating

even "low stress" jobs explaining that plaintiff has constant pain, muscle fatigue, and difficulty

with concentration.  Id.

               With regard to plaintiff's functional limitations, Dr. Jacobs opined that plaintiff

could walk two (2) city blocks without rest, could sit for one (1) hour before needing to get up,

could stand for fifteen (15) minutes before needing to sit down or walk around, and could sit and

stand or walk for less than two (2) hours total in an eight (8) hour work day.  (Tr. 558).  Dr.

Jacobs opined that plaintiff would need a job which permitted shifting positions at will from

sitting, standing or walking.  Id.  Dr. Jacobs opined that plaintiff would need to take unscheduled

breaks during an eight (8) hour work day, likely every twenty (20) minutes for ten (10) minutes.

Id.  Dr. Jacobs also opined that plaintiff's legs would need to be elevated during prolonged

sitting at a sixty (60) degrees.  (Tr. 559).  Dr. Jacobs indicated that plaintiff did not use a cane or

other assistive device while engaging in occasional standing or walking.  Id.  Dr. Jacobs opined

that plaintiff could never lift or carry less than ten (10) pounds and that plaintiff could never

twist, stoop, crouch, climb ladders, or stairs.  Id.  Dr. Jacobs opined that plaintiff had significant

limitation in doing repetitive reaching, handling, or fingering explaining that plaintiff could

grasp, turn, or twist objects for ten (10) percent of an eight (8) hour work day bilaterally; could

perform fine manipulations for ten (10) percent of an eight (8) hour work day bilaterally; and

could reach for fifteen (15) percent of an eight (8) hour work day bilaterally.  (Tr. 559-60).

Finally, Dr. Jacobs opined plaintiff would be absent from work as a result of his impairments or

treatment more than four (4) days per month.  (Tr. 560).

               The ALJ assigned little weight to Dr. Jacobs' opinion explaining:

> Little weight is given to the treating source statement of Dina
> Jacobs, M.D.  The limitations given are extensive and generally

inconsistent with the overall record, including Dr. Jacobs' own treatment notes. The [plaintiff] was observed to be manage well on changes medication (sic) and on physical examination showed normal gait and generally intact sensation except to vibrations in the fingers and toes.

(Tr. 17-18) (internal citations omitted).

Plaintiff contends that the ALJ failed to appropriately consider that Dr. Jacobs was a treating source and failed to appropriately evaluate Dr. Jacobs' opinion under the 20 C.F.R. § 416.927(c) factors. Pl. Br. at 7. Plaintiff explains that although the ALJ acknowledged that Dr. Jacobs was a treating source, the ALJ did not give any "obvious consideration to the fact that treating sources are generally preferred" and that the ALJ failed to appropriately evaluate Dr. Jacobs' opinion under the 20 C.F.R. § 416.927(c) factors. Id.

Dr. Jacobs is a treating source.[2] The Regulations direct that a treating source's opinion is entitled to controlling weight when supported by medically acceptable clinical and laboratory diagnostic techniques and is consistent with other substantial evidence in the record. See 20 C.F.R. § 404.1527(c)(2)[3]. A treating source's opinion may be rejected "on the basis of contradictory medical evidence." Plummer, 186 F.3d at 429. A treating source's opinion may also be rejected if it is contradicted by the physician's own treatment notes or the patient's activities of daily living. See Smith v. Astrue, 359 Fed.Appx. 313, 316-17 (3d Cir. 2009). However, an ALJ must consider the entire record rather than simply the portions that support his decision. Daring v. Heckler, 727 F.2d 64, 70 (3d Cir. 1984) ("[The court is] obliged to read [the] evidence in its totality, rather than to take bits and snatches of it out of context…"). A treating

---

[2] A treating source is "[the claimant's] own acceptable medical source who provides [the claimant], or has provided [the claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R. § 404.1527(a)(2). The claimant must see the source with "a frequency consistent with accepted medical practice for ... [the claimant's] medical condition(s)." Id.

[3] The Social Security Administration recently amended the regulations governing the treatment of medical evidence. See, e.g. 20 C.F.R. §§ 404.1527, 416.927 (stating that the rules in these sections apply only to claims filed before March 27, 2017). Plaintiff's claim was filed prior to March 27, 2017, so the pre-amendment regulations apply here.

source's opinion may be accorded "more or less weight depending upon the extent to which supporting explanations are provided." Plummer, 186 F.3d at 429 (citing Newhouse v. Heckler, 753 F.2d 283, 286 (3d Cir. 1985)).

When a treating source's opinion is not given controlling weight, the regulations provide a list of factors for the ALJ to consider in assigning the appropriate weight. 20 C.F.R. § 404.1527(c)(2). The factors include: the longitudinal treatment history, including the length of the treatment relationship and frequency of treatment; the nature of the treatment relationship; the relevant evidence provided by the source to support their conclusions; the consistency of the opinion with the record as a whole; whether the opinion is rendered by a specialist regarding their particular area of specialty; and any other relevant factors brought to the agency's attention. 20 C.F.R. § 404.1527(c)(1)-(6); see also Irelan v. Barnhart, 82 Fed. Appx. 66, 71 (3d Cir. 2003). The regulations also explain that "[w]e will always give good reasons in our ... decision for the weight we give your treating source's medical opinion." 20 C.F.R. 404.1527(c)(2).

"While the ALJ is, of course, not bound to accept physicians' conclusions, he may not reject them unless he first weighs them against other relevant evidence and explains why certain evidence has been accepted and why other evidence has been rejected." Cadillac v. Barnhart, 84 Fed. Appx. 163, 168 (3d Cir. 2003) (citing Kent v. Schweiker, 710 F.2d 110, 115 n.5 (3d Cir. 1983)) (internal quotations omitted). In choosing to reject a treating physician's assessment, an ALJ may not make "speculative inferences from medical reports" and may not reject a treating physician's opinion "due to his or her own credibility judgments, speculation or lay opinion." Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000). "A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on a continuing observation

of the patient's condition over a prolonged period of time." Id. (internal citation omitted).

In the present case, the ALJ afforded Dr. Jacobs' opinion "little weight". (Tr. 17). Initially, this court recognizes that Dr. Jacobs' opinion was primarily a "check the box" opinion and that such "[f]orm reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best." Mason v. Shalala, 994 F.2d 1058, 1065 (3d Cir. 1993). The Third Circuit has explained that the reliability of such check the box reports are "suspect" when "unaccompanied by thorough written reports." Id. (internal quotations omitted).

Nevertheless, we find the ALJ failed to sufficiently explain her reasoning for rejecting Dr. Jacobs' opinion. The ALJ noted that the limitations opined by Dr. Jacobs are inconsistent with the record, pointing to the fact that plaintiff had a normal gait and generally intact sensation. (Tr. 17-18). However, review of the record shows that plaintiff's physical limitations were more appropriately attributed to his extreme fatigue and not gait abnormalities or loss of sensation. (Tr. 499, 506, 509, 567, 700, 714, 726). We agree with plaintiff that the ALJ's reliance on the fact that plaintiff had a normal gait and generally intact sensation does not "build an accurate and logical bridge between the evidence and the result." See Pl. Br. at 17 (citation omitted). The MS symptoms that debilitate plaintiff are severe fatigue and eye issues. Additionally, the ALJ noted that "[plaintiff] was observed to be managed well on changes in medication (sic)[.]" (Tr. 17-18). However, review of the record shows that when plaintiff changed medication, he had a reaction to the new medicine requiring the infusion to be stopped and plaintiff to be administered IV fluids. (Tr. 717). Then when plaintiff began a second new medication, he reported increased fatigue. (Tr. 726). Therefore, the reasons given by the ALJ for discounting Dr. Jacob's opinion are insufficient, and we find, contrary to the evidence of record.

Moreover, it is not apparent on the face of the ALJ's opinion that the ALJ

considered Dr. Jacobs' area of specialty, pursuant to 20 C.F.R. § 404.1527(c)(5). Dr. Jacobs is a treating neurologist who specializes in MS. (Tr. 310). Additionally, the ALJ made no mention of the length of the treatment relationship and the frequency of examination, pursuant to 20 C.F.R. § 404.1527(c)(2)(i). The ALJ also did not reference Dr. Jacobs' opinion that plaintiff would be absent from work more than four (4) days per month as a result of his impairments or treatment. (Tr. 560).

The Third Circuit "has long been concerned with ALJ opinions that fail properly to consider, discuss and weigh relevant medical evidence." Fargnoli v. Massanari, 247 F.3d 34, 42 (3d Cir. 2001). "An ALJ may not reject pertinent or probative evidence without explanation." Johnson v. Comm. of Soc. Sec., 529 F.3d 198, 204 (3d Cir. 2008). Therefore, the Third Circuit has held an "ALJ's failure to explain his implicit rejection of [. . .] evidence or even to acknowledge its presence [is] error." Cotter v. Harris, 642 F.2d 700, 707 (3d Cir. 1981). However, the ALJ is not required "to use particular language or adhere to a particular format in conducting [the] analysis," the ALJ must sufficiently develop the record and explain the findings made so as to permit meaningful judicial review. Jones, 364 F.3d at 505. Inadequate discussion that leaves a court to speculate on what evidence led the ALJ to the conclusions set forth in the decision precludes any meaningful judicial review. See Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir.2000); Kephart v. Richardson, 505 F.2d 1085, 1090 (3d Cir.1974) ("It is incumbent upon the [ALJ] to make specific findings—the court may not speculate as to [the ALJ's] findings.").

Here, the ALJ's decision fails to sufficiently develop the record and explain the findings made because the ALJ does not appropriately evaluate Dr. Jacob's opinion and fails to consider whether plaintiff's MS symptoms, most notably fatigue, is consistent with the

limitations in Dr. Jacobs's opinions. As such we find substantial evidence does not support the

ALJ's opinion and that remand is required.

## **CONCLUSION**

Based upon the above, plaintiff's request for review is GRANTED, and the matter

is remanded to the ALJ for further consideration.


BY THE COURT:

___/S/ LINDA K. CARACAPPA_____
LINDA K. CARACAPPA
UNITED STATES CHIEF MAGISTRATE JUDGE